*[24]
 
 CARLISLE B. ROBERTS, Judge.
 

 On July 19, 1976, after notice to the plaintiffs and the hearing on their petition, pursuant to ORS 308.580—308.600, the defendant issued its Order No. A&AU 76-42 determining that the true cash value, as of January 1,1976, of the plaintiffs’ operating railroad properties allocable to the State of Oregon was $42,085,201.
 

 On July 21,1977, following the same procedure, the defendant issued its Order No. A&AU 77-49, determining that plaintiffs’ railroad operating properties in Oregon as of January 1,1977, had a true cash value of $40,570,036. Plaintiffs have appealed to this court pursuant to ORS 308.620 and the suits were consolidated for purposes of trial. (Tax Court No. 1098 relates to the assessment date January 1, 1976; Tax Court No. 1181 relates to the assessment date January 1, 1977.)
 

 Burlington Northern, Inc., is a Delaware corporation qualified to do business in the State of Oregon and has its principal place of business in St. Paul, Minnesota, with Oregon offices in Portland, Oregon. It is a common carrier with operating properties in the State of Oregon and 16 other states and two provinces of Canada. Oregon Trunk Railway is a Washington corporation qualified to do business in the State of Oregon and has its principal place of business in Portland; it is a common carrier by railroad with operating properties in Washington and Oregon and is a wholly owned subsidiary of Burlington. Oregon Electric Railway Company is an Oregon corporation with its principal place of business in Portland. It is a common carrier by railroad with operating properties in Oregon and is a wholly owned subsidiary of Burlington.
 

 It is the defendant’s duty to make an annual assessment of railroad operating property within the state, using an assessment roll prepared by its Utilities Section pursuant to ORS 308.515. For the
 
 *[25]
 
 purposes of ORS 308.505 to 308.665, "property” is specifically defined in ORS 308.510 to include "all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service * * *,” including lands and buildings, rights-of-way, roadbed, rolling stock, and the like. ORS 308.555 espouses the "unit valuation of property,” and provides for the allocation of Oregon and non-Oregon values. ORS 308.565 provides for the apportionment of the allocated unit valuation to the several Oregon counties into or through which the rail lines of the plaintiffs extend or are operated.
 

 As stated in Burlington Northern’s 1975 Annual Report (PI Ex 5, inside front cover):
 

 "Burlington Northern is a transportation business and a natural resource business. The transportation business consists of a major transcontinental rail system, a common carrier truck line, and one of the nation’s largest air freight forwarders.
 

 "The natural resource business includes the sale of timber from company lands, the manufacture and sale of forest products, and the development and management of oil, gas, coal, taconite, and other mineral resources to produce working interest and royalty income.
 

 "Other activities include the development and management of industrial, agricultural, and commercial lands, fixed base aircraft sales and service, and a small telephone company.”
 

 The foregoing description suggests the difficulty of determining the plaintiffs’ railroad operating unit within and without Oregon and to keep that working unit separate and apart from the numerous other activities which are reflected in the plaintiffs’ balance sheet. However, the parties appear to be substantially in agreement as to the proper unit and they have acted uniformly in assessing to the property user the "property owned, leased, rented, chartered or otherwise held for or used by it in performing” the unit’s business,
 
 *[26]
 
 pursuant to ORS 308.517, and omitting property which is leased, rented, chartered or otherwise assigned for the use or benefit of another operator.
 

 In making its annual assessment, the defendant is required to determine the true cash value, as of the assessment date, of the property assessable by it. ORS 308.555. ORS 308.205 (1977 Replacement Part) defines "true cash value”:
 

 "True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property. * * *”
 

 The defendant’s pertinent regulation is OAR 150-308.205-(A):
 

 "A. Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed.”
 

 The determination of "true cash value” ("market value”) is difficult to determine under the best of circumstances because of factors of utility, scarcity, demand, and transferability. The definition above quoted adverts to the best method or approach to value known to appraisers; viz., the market data approach, based on sales of comparable properties. Unfortunately, the unit of value of the type here considered is virtually never sold. Substituted approaches must be utilized and yet, in each instance of their use, the witness must hypothesize a "willing buyer/willing seller” scenario, thus creating a sense of unreliability.
 
 (See
 
 Tr 248-249, testimony of plaintiffs’ expert witness, Mr. Woolery.)
 

 
 *[27]
 
 In the case of the valuation of a railroad operating unit, three approaches are customarily used: Cost, Stock and Debt, and Income. The expert appraisers for both parties have adverted to each of these approaches, obtained an indicated unit valuation under each approach and correlated the results. The weight to be given to each approach and the variations among the appraisers in the minutiae of their methods were strongly disputed at trial and left to the court to consider. Both parties submitted the testimony of expert witnesses who prepared appraisal reports particularly for these suits (taking advantage of ORS 305.425 which provides that proceedings before the tax court shall be original, independent proceedings, to be tried de novo).
 

 The defendant’s expert witness, Mr. Richard V. Green, has recommended values of $59,960,000 and $58,320,000 for the assessment dates of January 1, 1976, and January 1,1977, respectively, substantially in excess of the amounts determined by the defendant as evidenced in its two orders,
 
 supra.
 
 Although defendant has pleaded only that the orders referred to be affirmed, the court must take note of ORS 305.435 which provides that: "[w]here the determination of true cash value * * * is an issue before the court, the court has jurisdiction to determine such value on the basis of the evidence before it, without regard to the values pled by parties.”
 

 Expert appraisers presented by the parties were Mr. John E. Green, of Montgomery, Alabama (hereinafter called "plaintiffs’ Green”), and Mr. Arlo Woolery, of Cambridge, Massachusetts, independent fee appraisers presented by the plaintiffs; and Mr. Richard V. Green, Appraisal Engineer in the Utility Section of the Oregon Department of Revenue (hereinafter called "defendant’s Green”). Plaintiffs’ appraisers have national reputations in the field of utility and railroad appraisals. Defendant’s Green has been continuously employed as an appraisal engineer by the defendant since December 1955 and has made
 
 *[28]
 
 scores of appraisals of railroad properties since January 1961.
 

 Plaintiffs’ Green, in his testimony and written appraisal reports (PI Exs 20 and 21) for the assessment years 1976 and 1977, respectively, gave consideration to the cost, stock and debt, and income approaches to value. He stressed the importance of unit valuation within the central assessment procedure (PI Ex 20, at 3-4), that the value for tax purposes is not the same as value for railroad and utility rate-making purposes, and described the problems relating to each of the approaches to value in the absence of sales of comparable property.
 

 In his consideration of the cost approach, the witness inferred the need for caution in its use in these cases. He distinguished between original cost, book value, reproduction cost and replacement cost and noted that it is a rare event for any one of these to be the same thing as true cash value.
 

 «* * * Jn rare instances where an item is new and represents the most modem item available and is a proper improvement, then cost and value are the same. In the appraisal of railroad property, as well as most types of property which the appraiser encounters, there are items of obsolescence present when considering the Cost Approach. With the rapid advance in technology, as well as rapidly changing economic conditions, the amount of obsolescence which is attributable to most properties is substantial. This is especially trae in the instance of railroad properties. * * *” (Pl Ex 20, at 7.)
 

 The use of the cost approach is based on the principle of substitution, which states that the maximum value of a property tends to be set by the cost of construction of an equally desirable and valuable substitute property, assuming no costly delay is encountered in making the substitution.
 
 (See
 
 American Institute of Real Estate Appraisers,
 
 The Appraisal of Real Estate
 
 33-34 (7th ed, rev 1978).) As indicated by the descriptive titles of the varying types of costs (described by plaintiffs’ Green,
 
 supra),
 
 different approaches may be used
 
 *[29]
 
 in varying situations but, in each instance, adjustment must be made for loss of value in the property being appraised because of physical deterioration, functional obsolescence and economic obsolescence. Plaintiffs’ Green gave as justification for use of the cost approach:
 

 "* * * The courts have held in nearly all jurisdictions that cost, less allowance for depreciation, is an acceptable evidence of value for railroad property when used in conjunction with other evidence of value. In view of the courts’ acceptance of cost less depreciation as an evidence of value, the appraiser of railroad property must consider cost as one evidence of value. * * *” (Pl Ex 20, at 9.)
 

 Plaintiffs’ Green submitted that appraisers usually agree that the rates of depreciation allowed by the Interstate Commerce Commission reasonably reflect physical deterioration but do not give consideration to functional or economic obsolescence. (Pl Ex 20, at 9.) He goes on to say:
 

 "* * * In recent years, there has been a continually accelerating trend toward improving railroad equipment. This rapidly increasing obsolescence has not been recognized by the Interstate Commerce Commission in the rates of depreciation which have been allowed. This can be clearly illustrated by reference to the 1976 edition of the
 
 Yearbook of Railroad Facts,
 
 published by the Association of American Railroads. The rates of return on net property investments during the last 15 years have been entirely unsatisfactory. If the Interstate Commerce Commission had allowed sufficient rates of depreciation to include functional and economic obsolescence, the net investment on the books of the railroads would have been decreased to a realistic figure and the amount of return on a proper net investment figure would be at an acceptable rate. The return on net property investment, which includes cash and supplies, and net property investment as reported to the Interstate Commerce Commission for the years 1960-1975, as shown in the above stated yearbook, are in order as follows: 2.13,1.97, 2.74, 3.12,3.16,3.69,* * *. If proper functional and economic obsolescence had been allowed by the Interstate Com
 
 *[30]
 
 merce Commission, the net investment would have been reduced to a realistic figure, and the rates of return would have been two and one-half to three times higher than the actual rates which are shown above. Since it is obvious that functional and economic obsolescence are not reflected in the I.C.C. reports, these two items must be measured and deducted [for the purposes of the witness’s appraisal]. It is my opinion that the most accurate method of measuring obsolescence is by comparing the subject property with so-called 'super blue chip’ method. This relates the various factors of the railroad under appraisement with the average of the highest factors of a large representation group of Class I railroads. This method requires three steps in estimating obsolescence. The first step is the careful selection of a number of recognized indicators of operating quality and efficiency in a railroad transportation system. In appraising a long-haul railroad, there are eight quality factors which are usually applicable. The eight quality factors are: 1. Rate of return; 2. Freight traffic density; 3. Load factor; 4. Transportation performance; 5. Operating ratio; 6. Transportation ratio; 7. Gross profit margin; [and] 8. Gross revenue per mile of road.
 

 "The second step in this approach is to compile data on a representative number of Class I railroads. From this data, the average of the highest three of each factor is used to provide a standard whereby the’ operating efficiency of the railroad being appraised can be compared. * * * A potential buyer of a railroad property would in all likelihood take into account most of these factors in arriving at the amount which he would be willing to pay to acquire the railroad property.
 

 "The third step requires comparing the eight quality and efficiency factors for the railroad being appraised to the 'super blue chip’ standard established in the second step. * * *
 

 "It must be remembered that the 'super blue chip’ method does not entirely eliminate the obsolescence which is present in the subject railroad. This is due to the fact that the railroads used in the study also have some obsolescence * * * and thus [the exercise] does not eliminate this portion of the obsolescence which would be present in the subject railroad. Due to this fact, the value
 
 *[31]
 
 indication by the Cost Approach will be the highest value indicator in almost every instance in which the 'super blue chip’ method of estimating obsolescence is used.” (Pl Ex 20, at 10-11.)
 

 Plaintiffs’ Green then gathered the necessary data for each of the eight quality factors, compiled from a study of 13 railroads, taking therefrom the average of the three highest values calculated for each quality and efficiency factor, to be used as a standard in measurement for comparison with the subject property. Using information contained in the plaintiffs’ reports to the Interstate Commerce Commission (Pl Exs 3, 4, 9, 10, 11 and 12), he determined the subject property’s status with regard to each of the eight factors. (Pl Ex 20, at 22-24.)
 
 *
 
 These were compared to the "standard” established by the study of efficiency factors in the 13 railroad systems above mentioned
 
 {see
 
 Pl Ex 20, at 28), to find an indicated percent of obsolescence for plaintiffs’ system of 54.38 percent. Reducing the property used in the transportation service less the depreciated investment in all licensed vehicles (not merely those which are exempt from taxation in Oregon) and applying the obsolescence factor of 54.38 percent, the appraiser obtained an indicated system value of property used in the transportation service by the cost approach, to which was added materials and supplies on hand (in the sum of $160,726,000) for an indicated value of operating property, using the cost approach, of $1,367,698,000, rounded to $1,368,000,000. (Pl Ex 20, at 29.)
 

 Plaintiffs’ Green then gave consideration to the use of the stock and debt approach. He pointed out
 
 *[32]
 
 that the typical market data approach is not possible in the appraisal of railroad property because railroads are not sold as operating units. The transactions which do occur are usually a merging or pooling of interests. The sale of a small fractional portion of railroad property is not considered to be an indication of the value of the operating unit. Accordingly, the stock and debt approach is used as a substitute for the normal market data approach on the theory that the value of an entire corporate unit may be obtained from the sum of all the market value of the liabilities of the corporation.
 

 "* * * The theory is based upon the balance sheet equation that total assets must equal total liabilities and capital items. Under this theory, any change in the value of the assets will be reflected by a similar change on the liabilities and capital side of the balance sheet.” (Pl Ex 20, at 12.)
 

 This approach to value can only be used if a corporation’s stocks and bonds are actively traded on the securities market and the total trading price of these securities, as of a given date, will provide an estimate of the total market value of all the corporation’s assets. Plaintiffs’ Green pointed out that this assumption has many flaws. However, at an early date, in the "State Railroad Tax Cases,” 92 US 575, 23 L Ed 663, 2 AFTR 2367 (1876), the United States Supreme Court approved the stock and debt approach as an indicator of value and consideration is given to it by all experienced appraisers of utility property.
 
 See
 
 I Bonbright,
 
 Valuation of Property
 
 246 (1937); II Bonbright 642.
 

 Of course, in the use of this approach for that part of the corporate property which is used as a basis for Oregon’s ad valorem tax, it is necessary to eliminate the influence of nonrelated activities (whether other railroad units, other transportation services, mines, mills, etc.) from the value of the corporation’s securities. Plaintiffs’ testimony shows that while the rail properties involved in this proceeding contribute
 
 *[33]
 
 the bulk of the consolidated gross revenues of Burlington Northern, they contribute only approximately one-half of the consolidated net revenues. Although 90 percent of the total employees and 90 percent of the total wages paid are ascribable to the railroad operations, the rate of return from the railroads is approximately two to three and one-half percent while the rates for all other activities range from 20 to 27% percent. (Tr 60-71; PI Ex 19.) Plaintiffs’ Green stated:
 

 "* * * The most acceptable method of removing nontaxable assets from the total value of assets indicated by the Stock and Debt Approach is by measuring the influence that the nontaxable or nonoperating assets have on the market value of the securities by relating the income from such assets to the total income available to the security holders. The ratio derived by this method is applied to the gross stock and debt valuation to arrive at the indicated value of the taxable unit by the Stock and Debt Approach. It is my opinion that this method of eliminating non-taxable or nonoperating assets is logical. * * * To use the ratio of nonoperating income to total income, including net railway operating income and other income of nonoperating assets to eliminate non-operating properties is, in most instances, taking a very conservative approach.” (Pl Ex 20, at 13-14.)
 

 Thereupon, plaintiffs’ Green listed each class of stock and debt separately. The number of shares of common stock outstanding was multiplied by the market price per unit. The number of shares of preferred stock was multiplied by the market price per emit. The market price of mortgage bonds, conditional sale contracts and equipment obligations was determined from financial publications. Miscellaneous obligations and current liabilities were reflected at par. The sum of the market value of stock and debt was $1,515,645,000. This represented the total enterprise value which included those items which are not part of the unit subject to assessment.
 

 The items not subject to assessment were eliminated from the enterprise value by the use of the "influence method.” The influence method removes
 
 *[34]
 
 the nonassessable items by determining the ratio of nonoperating income to income available to security holders. Applying this ratio (49.38 percent) to the enterprise value of $1,515,645,000 produced a deduction for nonassessable property of $748,425,000 and resulted in a value of the operating unit by the stock and debt approach of $767,250,000. (Pl Ex 20, at 31-36.)
 

 Plaintiffs’ Green testified that the income approach is universally used in the appraisal of railroad property and is generally considered the most meaningful approach.
 

 "* * * Certainly there is no doubt that the prospective purchaser of an income-producing property will place primary weight on the anticipated income. The basic theory of the Income Approach is that the value of a property is the present worth of the net income it will produce during the remainder of its productive life. * * *” (Pl Ex 20, at 15.)
 

 The normal goals of an investor are twofold: The return
 
 on
 
 his investment; the return
 
 of
 
 his investment.
 
 (See Pacific Power & Light Co. v. Dept. of Rev.,
 
 7 OTR 203, 221 (1977),
 
 modified and remanded
 
 286 Or 529, 596 P2d 912 (1979).) All or part of an investment is subject to depreciation. Since land normally does not wear out or depreciate, it can be capitalized into perpetuity by means of an interest rate and the recapture of the investment takes place at the time of resale. However, a wasting asset, such as the locomotive or a railroad track, depreciates with the passage of time and of use and, at the end of its economic life, may have a salvage value, a junk value, or be worthless. It must, therefore, be recaptured by some method during the term of its life.
 
 (See Ring, The Valuation of Real Estate
 
 50-52 (2d ed 1970).)
 

 A number of important factors must be considered in a contemplation of the income approach to value. The principal factors involve quantity of income (how much gross and net income can be anticipated), quality of income (financial responsibility of tenants or users of service), and durability of
 
 *[35]
 
 income (how long the income will continue). (International Association of Assessing Officers,
 
 Assessing and the Appraisal Process
 
 80-87 (5th ed 1974).) The elements of capitalization are
 
 income, rate and value.
 
 If two of these elements are known, the third can be determined through formulas: I = V x R, V = I -h R, R = I V. The basic steps necessary to present a reasonable and supportable value indication using the income approach to value require (1) an estimate of the effective gross income; (2) an analysis of the expenses; (3) an estimate of the net income (effective gross income less expenses); (4) the selection of a capitalization rate (through one of three methods; i.e., comparison with market data, which are not available in this instance; the summation method or "built-up rate”; the "band-of-investment method”); (5) the selection of a depreciation rate for wasting properties; (6) the selection of a technique for differentiating between depreciable and nondepreciable property; and (7) the computation of the value by a capitalization of income derived from the foregoing steps.
 
 (Assessing and the Appraisal Process, supra,
 
 ch 7.)
 

 Plaintiffs’ Green has discussed his use of the income approach in Pl Ex 20, at 15-19 and 39, and set out his determination of a capitalization rate as of December 31,1975, for the assessment date January 1,1976, in Pl Ex 20, at 37, followed by a schedule showing the estimated future income to be capitalized, Pl Ex 20, at 38. The witness submitted that in these suits the income to be capitalized is net railway operating income; i.e., the amount of income earned and available to the bondholders and stockholders of the corporation (the amount that the hypothetical prospective purchaser of a railroad could anticipate as accruing to himself through the ownership and operation of the railroad).
 

 "The item of primary importance is that the income flow to be capitalized be a true and reasonable estimate of future income prospects. If income could be exactly forecast and if the proper capitalization rate could be
 
 *[36]
 
 determined without question, the value estimate as indicated by the Income Approach would be the actual market value. However, it is impossible to accomplish such a goal since the appraiser is required to foresee the future earnings and expenses and to evaluate the capitalization rate that a purchaser will place on such anticipated earnings.” (Pl Ex 20, at 16.)
 

 Plaintiffs’ Green accepts as generally true that the income shown on the plaintiffs’ Interstate Commerce Commission reports is reasonably accurate but contends that consideration must be given to the fact that under the ICC accounting rules, railroad tax accruals include income taxes applicable to nonoperating property which is outside the scope of the present appraisal. Correction of'this and some other items is necessary in order to arrive at the correct operating income over past years from which an estimate of future operating income can be forecast. Account should also be taken of the fact that the Interstate Commerce Commission generally allows less than the actual depreciation loss in the value of operating property and that net railway operating income is overstated to the extent that the depreciation rate allowed is insufficient (including the important factor of obsolescence).
 

 The witness adopted the definition of capitalization rate published by the American Institute of Real Estate Appraisers,
 
 Appraisal Terminology and Handbook
 
 (5th ed 1967), at 31:
 

 "The percentage which is the sum of the interest rate and recapture rate (if [the property is] improved) and which expresses the relationship between the value of the property and its share of net income before depreciation.”
 

 He then quotes from the American Institute of Real Estate Appraisers,
 
 The Appraisal of Real Estate
 
 (5th ed 1967), at 268 (paraphrased in the 7th ed, at 367):
 

 "Generally the rate to use in an appraisal problem is the rate which investors in that type or class of property require as a condition for purchasing. The rate which such investors require varies from time to time depend
 
 *[37]
 
 ing upon economic conditions. Accordingly, the appraiser must carefully consider competitive market conditions, because they influence the opinions and actions of investors.”
 

 Plaintiffs’ Green decided that the summation method was the least desirable in estimating the capitalization rate because the only known fact in the derivation of a capitalization rate by this method is the so-called "safe” rate, generally applicable only to government bonds. The other factors in the rate are highly subjective. Further, since railroad properties are not sold as units, there is no possible use of the comparative method which is based upon a comparison of market transactions. (The witness observed that it is possible to use the comparative method if one adopts the value for the total enterprise indicated by the stock and debt method as an approximation of total value, but it was his opinion that the total value obtained by that method is a very weak indication of value for reasons which have been set out in Pl Ex 20, at 12-14.) The band-of-investment method recognizes that a potential buyer in any substantial undertaking will pay some part in cash and finance the remainder of the total (which constitutes the indebtedness of the property). The witness found that typical capital structures as shown on the books of Class I railroads indicated a capital structure of more than 35 percent debt and less than 65 percent equity. He then reasoned:
 

 "* * * It is logical to assume that the purchaser of railroad property today could finance 40 percent or more of the purchase price depending upon the characteristics of the particular railroad and that the remaining 60 percent or less would have to be raised by equity capital. Therefore, the capitalization rate must be based upon a combination of debt and equity at appropriate rates of return. In addition, study is necessary to arrive at an estimate of the return demanded by equity capital. A study of some 14 (end of 1975) railroads listed in Standard and Poor’s Stock Guide revealed that the median price earning multiple was 8.0. Economic conditions in 1975 caused the investor in stocks to be very pessimistic. After considering all of the data available, it seems
 
 *[38]
 
 reasonable to assume that an investor would require 16 percent on equity capital.” (Pl Ex 20, at 19.)
 

 The witness then demonstrated that if the cost of funded debt were 10 percent with 40 percent debt and assuming the cost of equity capital at 16 percent, the capitalization rate would be approximately 13.5 percent. This rate assumes new financing and would be proper if the purchaser were acquiring all the equity and refinancing all the debt from an existing railroad. "The normal approach to buying a railroad would be to purchase the common stock and assume the existing debt which would very likely be at less than 10%. The indicated capitalization rate under these circumstances would be from 10%% to 11%%.” (Pl Ex 20, at 19.) The witness finally concluded that an investor, after considering the capital structure, cost of existing debt and a return on equity consistent with the risks involved, would require an overall return of 10.5 percent on his investment. (Pl Ex 20, at 39.)
 

 The witness examined the 5-year earnings history of the subject property from 1971 through 1975 and found an unweighted average for the 5-year period of $52,225,000. Recognizing that a greater accuracy in estimating the future was achieved by giving greater weight to the most recent year, he developed a 5-year weighted average by giving a weight of five to the latest year (1975), a weight of four for 1974, of three for 1973, of two for 1972, and one for 1971, which was found to give an anticipated net railway operating income of $54,926,000. This figure was adjusted by adding a net lease equipment rental of $16,287,000 ($27,114,427 rental less depreciation of $10,827,000) to obtain an adjusted net railroad operating income of $71,213,000. (The witness noted at this point that if the 48 percent federal income tax rate were applied to this $16,287,000 adjustment, it would reduce it to $8,469,240, and would reduce the final value determined by the witness ($678,250,000) by $80,659,430, but the witness took no action in this regard.)
 

 
 *[39]
 
 Using the capitalization rate of 10.5 percent, as established above, the $71,213,000 adjusted net railroad operating income gives an indicated value of $678,219,000, which he "rounded” to $678,250,000.
 
 (See
 
 PI Ex 20, at 38.)
 

 In his correlation of value indicators (PI Ex 20, at 40-41), the witness recapitulated that, under the cost approach, he had found an indication of value of $1,368,000,000; under the stock and debt approach, $767,250,000; and under the income approach, $678,250,000. He noted that the variation between the stock and debt approach and the income approach was 13.12 percent. He concluded that the value indication of the cost approach was substantially higher than the other two methods because the use of the "super blue chip” method for estimating obsolescence fails to eliminate all of the obsolescence present in the subject railroad. "Also, railroad cost data includes many factors which do not represent value in today’s market. The value indication by the Cost Approach is the weakest of the three approaches. * * *” (PI Ex 20, at 40.) The witness pointed out that the data found in section G of the addenda to PI Ex 20, a mass of detail with particular emphasis on the financial data of railroads, was of great assistance to him in arriving at the capitalization rate used in his income approach.
 

 After considering each of the three approaches and weighing the relative merits thereof, it was the witness’s opinion that the market data of the subject property as of January 1, 1976, was $750,000,000. (The witness never revealed the weight he accorded to each approach, although he indicated a negative attitude with respect to stock and debt and stated, PI Ex 20, at 40, that "the Cost Approach is the weakest of the three approaches. * * *”) He considered an allocation factor of 2.826 percent as reasonable in determining the Oregon portion, giving an indicated value of $21,195,000, of which he ascribed 59.90 percent, rounded to $12,695,800, to the Burlington Northern, Inc., property; 17.96 percent or $3,806,600 to the Ore
 
 *[40]
 
 gon Electric Railway Company; and 22.14 percent, rounded to $4,692,600, to the Oregon Trunk Railway. (Pl Ex 20, at 41.)
 

 Using the same procedures and techniques for the assessment date January 1, 1977, the witness found a total value of the operating properties within and without Oregon to be $800,000,000. Of this, he ascribed 2.779 percent to Oregon, for a total indicated value of Oregon operating properties of the Burlington Northern system of $22,232,000. Of this amount, 59.99 percent was ascribed to the Burlington Northern, Inc., rounded to $13,337,000; 21.6 percent to the Oregon Electric Railway Company, rounded to $4,802,100; and 18.41 percent to the Oregon Trunk Railway, rounded to $4,092,900. (Pl Ex 21, at 42.)
 

 The second expert witness presented by the plaintiffs was Mr. Arlo Woolery. His preparation as a witness in these suits was done independently, without contact of any sort with plaintiffs’ Green. However, he substantially followed the appraisal program and procedures used by plaintiffs’ Green, described above. He agreed with both Greens as to the necessity of treating plaintiffs’ railroad operation as a unit. He included the same operating properties and he used the same definition of market value.
 

 Mr. Woolery recognized that the chief difficulty in the cost approach in these suits is the "difficulty of estimating the loss in value due to functional and economic obsolescence * * (Tr 252.) He also attacked this problem in his cost approach by using a study of "blue chip” railroads, but utilized only six indicators of efficiency for railroad property out of the eight chosen by plaintiffs’ Green (omitting Green’s "load factor” and "transportation performance” and giving triple weight to "rate of return” and "gross profit margin”). He measured the subject property against an average of the three highest within the group of companies chosen for a sample (each of the sample railroads meeting his requirements of (a) profit making, (b)
 
 *[41]
 
 annual revenues in excess of $100,000,000, and (c) operating more than 1,000 miles of road). (Tr 252-253.) His property values included all property leased by the operating unit minus the property leased by it to others. He noted that the plaintiffs’ locomotive fleet is 100 percent diesel but nearly 50 percent of these locomotives are more than 15 years old, as are 50 percent of the 115,000 freight cars used in the operations (Pl Ex 22, at 16). He also made reference to the $35,000,000 of "deferred maintenance” shown in the R-l reports (Tr 284; Pl Exs 3, 4, 9-12). This item indicates that the plaintiffs’ expenditures for replacement and maintenance are below average for road and equipment. Nevertheless, he stated that he found the functional obsolescence to be only slightly above the average of the industry. (Pl Ex 22, at 17.)
 

 Following his individual application of the "blue chip” method, Mr. Woolery determined that the property values under the cost approach should be reduced by a percentage of 75.18 percent for economic and functional obsolescence (compared to plaintiffs’ Green who found 54.38 percent). Mr. Woolery’s allocations, measured by the establishment of a standard efficiency factor and making use of a normal curve as a scaling device, were deemed by him to show more accurately the range of obsolescence than was achievable through the simple division of the average into the factor for the subject property. (Tr 255; Pl Ex 24.)
 

 Mr. Woolery’s cost approach, therefore, adopted the net value shown by the ICC reports of the transportation property used in the continuous operation of the railroad ($2,348,528,938), to which figure he added the net book value of operating property leased from others ($315,703,418) to obtain the net value of total property used in transportation service. He reduced this total by 75.18 percent for obsolescence, leaving an indicated value of $661,262,471, to which he added a figure of $160,726,000 for "materials and supplies,” stating (Tr 270):
 

 
 *[42]
 
 "* * *
 
 Now
 
 to that we must add materials and supplies and there are people that will argue that materials and supplies should carry the same obsolescence as the operating plant and there might have been a time when you could make that argument, but now there is a large fuel oil figure in there which I think could be sold at a dollar for dollar value and most of these materials and supplies are in current use and even though they are going into a plant that is somewhat obsolescent, I think that including them at a dollar for dollar value, because I feel that they could be sold that way, is a realistic approach. * * *”
 

 He concluded that the value of the operating property indicated by the cost approach, on January 1, 1976, was $822,000,000 (rounded). (Pl Ex 22, at 27.) Using the same method for the assessment date January 1, 1977, and having calculated a rate of obsolescence of 78.86 percent for the prior year, he found an indicated value of operating property (rounded) of $761,000,000. (Pl Ex 23, at 26.)
 

 In his use of the stock and debt approach, Mr. Woolery apparently felt none of the misgivings expressed by both plaintiffs’ Green and defendant’s Green.
 
 (See
 
 Pl Ex 22, at 11-12.) He regarded it as "relatively simple and straightforward.” (Pl Ex 22, at 11.) He did admit that the method of excluding non-operating assets from the property used in the day-today operation of the railroad creates problems for the appraiser. The method used by him is described in Pl Ex 22, at 12, as follows:
 

 "The second method of excluding non-operating assets from the gross stock and debt relies upon allocating value based upon income contribution. If income from non-operating assets is stated separately, value can be prorated based upon the percentage of total income which is derived from the non-operating property. This method presumes that investors capitalize operating and non-operating income at the same rate. Even if this presumption is incorrect, this income allocation method is the most practical way of allocating the stock and debt indication of value between operating and non-operating property.”
 

 
 *[43]
 
 Using the same sources as plaintiffs’ Green and almost the same figures
 
 {see
 
 Pl Ex 22, at 30-36), he found the nonoperating property to be 44.45 percent of the total as opposed to the figure of 49.38 percent developed by plaintiffs’ Green. His conclusion of value for the 1976 year was $714,000,000 (rounded) as compared to the $767,250,000 found by plaintiffs’ Green for the same year. For the 1977 year, he found $650,000,000 as compared to $834,700,000 estimated by plaintiffs’ Green.
 

 In his stock and debt approach, Mr. Woolery did not include any value for capital contribution, allegedly derived from the income tax account, "accumulated deferred income taxes” (as did the defendant’s witness Green), pointing out that, in the stock and debt method, only those items which are bought and sold in the marketplace are included in the computation and the witness had never seen "one of these [accumulations] ever bought or sold * * (Tr 278.)
 

 Mr. Woolery’s understanding of the rationale for the income approach and the factors to be considered in determining values through this method were very similar to those declared by other experienced appraisers, including plaintiffs’ Green. Both witnesses recognized that the amount of value is directly related to the amount of anticipated income and that the two basic problems in the income approach (after obtaining reliable data on past income) are to determine the amount of income that can be expected in the future and deciding on the discount required to determine the present worth (as of the assessment date) of such future income (i.e., what a buyer would have to pay as of the assessment date for the right to receive the future income).
 

 In order to determine his capitalization rate as of January 1, 1976, Mr. Woolery used the weighted cost of capital ("the band of investment”). As in the case of the stock and debt approach, he took the value of each of the elements within the capital structure of the
 
 *[44]
 
 company (preferred stock, common stock, mortgage bonds, and equipment obligations) and multiplied each by the typical market rate of return for that type of security.
 
 (See
 
 Pl Ex 22, at 39.) Using information published by Salomon Bros., investment counsel, and from Moody’s Transportation Journal, he made estimates of typical railroad industry return during the period on preferred stock (10 percent), on common equity (13.5 percent), on mortgage bonds (9.7 percent), and on equipment obligations (9 percent). A relative weight was given to each of the four categories and these weights, multiplied by the respective rates of return, produced a weighted capitalization rate of 10.95 percent, which the witness rounded to 11 percent.
 

 Mr. Woolery’s next step was to obtain the Burlington Northern’s railway operating revenues as shown by the Interstate Commerce Commission reports for the years 1971 to 1975, inclusive, and from this base derive a net railway operating income for each of the said years. (Pl Ex 22, at 40.) In obtaining the net railway operating income over the 5-year period, he depended upon information in the ICC reports but made some further adjustments which he explained as follows (Tr 282):
 

 «* * * And I might explain that those adjustments include the consideration of the losses on passenger service in certain years and, since the passenger service is not a major item any more, I have added back those losses in the net railway operating income column. Also I’ve made some adjustments for investment tax credits even though they are flowed through under the Burlington Northern accounts and for accelerated depreciation. So that net railway operating income is my best estimate of what this company should produce from now on and those adjustments are made with the future in mind. * *
 

 No work sheets were offered in evidence to show the precise nature of the adjustments but some of the data on which the witness presumably relied are to be found in the addenda to the written appraisal report
 
 *[45]
 
 (Pl Ex 22). The witness described his next step in the following language (Tr 282-285):
 

 "A * * * Then I’ve taken the net railway operating income as a percentage of gross revenues for that five-year period to get some idea of the percent of gross revenues that this company should be bringing down to net railway operating income in the future and you’ll note that that average is about 6.45 percent over that five-year period. Then I’ve tried to figure out what kind of gross revenues we could anticipate in the immediate future from the railway operating property in use as of year-end 1975, and there I’ve used the least squares trend line method of projecting that future operating revenue. And it’s my opinion that in the year following December 31st, 1975, we should anticipate gross revenues of $1,440,100,000, and that if we were able to continue the average net railway operating income on gross revenues, the net railway operating income produced by the railway operating property in use year-end ’75 would be $92,886,450. Now there are a couple of correlation coefficients given there and the first one of .9809 for railway operating revenue trended would indicate a high statistical significance. When you have five factors and you’re looking at a secular trend or time trend line, that kind of a correlation coefficient would indicate a high degree of statistical significance. So I feel very comfortable with the billion four hundred and forty million projection of gross revenues, based upon historic trends. However, when you look at the correlation coefficient between net railway operating income and gross revenues, you see that the correlation coefficient is only .58 and that would indicate no particular statistical significance when you’re operating with a small sample of five years. So I don’t have a great deal of confidence that net railway operating income will increase with increased gross revenues. So moving, then, to the next page, which is in part summarized here, I’ve taken a simple five-year average of net railway operating income which shows $77,677,000, then a weighted five-year average to give more weight to the current years, a weighting of three for the year immediately past, a weighting of two for the two previous years, and then a weighting of one for the more remote years, and this would indicate on a weighted basis an average of
 
 *[46]
 
 $78,948,000. And then the trend line projection of $92,886,450. Now one of the problems in using the pure trend line figure is the deferred maintenance that this particular railroad has and if you look at the R-l reports you’ll see an item in excess of $35 million in deferred maintenance, and if part of that is to be liquidated in the immediate future, it would have to come out of this current income projection. So based upon this information, I would anticipate a net railway operating income from the properties in question, Burlington Northern, Inc., Oregon Electric and Oregon Trunk of $83 million in the year immediately following and if that is capitalized at 11 percent, it would indicate a value by the income approach of $754,545,456, which I have rounded to $755,000,000 in this appraisal report.
 

 "Q Mr. Woolery, on sheet A-l, pertaining to rate of return summary, you have not utilized all of the railroads that you used in connection with your obsolescence study on page 25 and would you explain why you haven’t?
 

 "A Yes. In part, the group on page 25 represents some cross ownerships in which there are not publicly traded securities so I couldn’t get the earnings price ratios to arrive at the return to equity. If you would look at Louisville-Nashville, it does not have stock traded directly, but trades as part of the Seaboard Coast Line and the Burlington Northern I had indicated shows a return of 13.81 percent, on page 39, and the 13% would be the conservative approach compared to the Burlington Northern. In a couple of cases, Missouri Pacific, in point, I was very suspicious of the figure that I got. It was 28 percent as the return to equity but I was at that time looking at Missouri Pacific in terms of its merger with Chicago Eastern Illinois and the Texas Pacific and I really wasn’t sure of my data in the equities market so I omitted the Missouri Pacific in this study. But if you will look at that 13.44 and then examine that in terms of the median, you would see that about 13.51 would be the median for this group and the Burlington Northern, 13.81, so I think that the 13.5 is a very reasonable choice as the rate of return to equity for typical railroad properties in the year in question.”
 

 Mr. Woolery’s correlation appears in Pl Ex 22, at 45-46, and his testimony at Transcript 288-289. He
 
 *[47]
 
 found that his income approach ($755,000,000) and his stock and debt approach ($714,000,000) differed by a little less than 6 percent while the cost approach ($822,000,000) and income approach differed by only 8.9 percent. As stated in his appraisal report (PI Ex 22, at 45):
 

 «* * * Investment property of this type is normally valued with emphasis on the income approach, which in this appraisal produces a value estimate which is well supported by both the stock and debt and cost approaches. It appears that the adjustment for functional and economic obsolescence in the cost approach is reasonable since the value estimate produced by this approach is consistent with the value estimates produced by the income and stock and debt approaches.”
 

 He then gives his opinion of value for the railroad operating property as of January 1, 1976, to be $760,000,000.
 

 Using the same methods for the assessment date January 1, 1977, he found that the income approach ($773,000,000) and the stock and debt approach ($650,000,000) value estimates differed by more than 20 percent while the cost approach ($761,000,000) and income approach differed by only 1.6 percent. (PI Ex 23, at 43.) His judgment was that the final value should be set at $770,000,000.
 

 Mr. Woolery’s method of allocation for January 1, 1976, is outlined in PI Ex 22, at 47. He finds that the allocation factor for the first year should be 2.71 percent, or $20,596,000; and for January 1,1977, 2.72 percent, or $20,944,000 (Pl Ex 23, at 44).
 

 Mr. Richard V. Green, appraisal engineer for the Oregon Department of Revenue, was the defendant’s principal expert appraisal witness (designated as "defendant’s Green,” to distinguish him from plaintiffs’ appraisal expert, Mr. John E. Green). Defendant’s Green also gave consideration to the cost approach, the stock and debt approach, and the income approach to value for each of the two years. His writ
 
 *[48]
 
 ten appraisal reports were greatly strengthened by the inclusion of detailed work sheets. (The key letter designations thereof are described at Tr 352.)
 

 Defendant’s Green was in general agreement with plaintiffs’ Green and Mr. Woolery as to the purpose of the appraisal, the definition of true cash value, and the railroad operating property which constituted the unit to be appraised. The three principal expert witnesses differed in many details in their individual developments of the three approaches mentioned. In his final correlation, defendant’s Green gave a weighted value of 30 percent to his cost approach and 70 percent to his income approach and rejected the stock and debt approach completely, concluding with an allocated Oregon value as of January 1, 1976, of $59,960,000 and for January 1, 1977, of $58,320,000. These sums were based on new appraisal reports (Def Exs D and E) which were prepared after the defendant’s issuance of its Orders No. A&AU 76-42 (Pl Ex 17) and No. A&AU 77-49 (Pl Ex 18).
 

 Although giving a weight of only 30 percent in his correlation, defendant’s Green deemed the cost approach to be significant in these suits. He described it as an indicator of value that provides a "quantity recognition of properties that might not be reflected” in the other approaches; e.g., rail transportation properties that might currently be idle because of age or newness. (Tr 341.) He also took note of the substantial number of locomotives and freight cars owned by other companies but leased and used by the Burlington Northern in the operation of its rail transportation business and which, under ORS 308.517, the defendant regularly assesses to the lessee (while excluding from the property factor similar equipment which is owned by the plaintiffs but leased and operated by others). In determining the value of property leased from others, he based his values upon the remaining useful life of the equipment, even if this period of time exceeded the period of the plaintiffs’ lease.
 
 {See Dei
 
 Ex E, App, Scheds LP-1 and LP-2.) He justified this proce
 
 *[49]
 
 dure on the basis of the definition of market value which the statute requires (not a lessee’s value). As replacement cost data were not readily available to the witness, he turned to book cost less depreciation.
 
 {See
 
 Def Ex D, at 7-8, and Scheds C-l to C-5 in the Appendix thereof, for the year 1976; the same method is followed for 1977 in Def Ex E, at 8-9, and similar schedules.)
 

 Under Interstate Commerce Commission accounting rules, much of the reported expenditures for roadway maintenance, notably for relaying rail, are charged to expense rather than being capitalized, and consequently such items are not depreciated in the ICC reports. However, the plaintiffs’ ICC reports show that expenditures have been made for new road property, including structures, equipment and track structure replacement, since the 1969 merger which resulted in the Burlington Northern, Inc., system, of annual amounts ranging from $120,000,000 to $282,000,000 (1970 to 1976, inclusive), for a total of $1,317,532,000 which, in the view of the witness, greatly reduced the potential obsolescence which appears to be typical of railroad properties.
 
 {See
 
 the testimony of defendant’s Green, Tr 356-358; Def Ex E, at 20-21.) Relying on Def Ex F (the letter of Haskins & Sells, Certified Public Accountants, dated December 12, 1967, and addressed to the Department of the Treasury, U.S.A., and to the Association of American Railroads, Washington, D.C.), the witness concluded that the ICC provision, using a retirement and replacement method of accounting for depreciation by railroads for property included under the headings of ties, rail, other track material, ballast, and track laying and surfacing, does not exceed that which would have been allowable under ratable depreciation methods. Accordingly, the witness has adjusted plaintiffs’ depreciation accounts to add thereto the expenses used for road replacement and betterment.
 

 In addition to this deduction for adjusted depreciation, he made a blanket provision for obsolescence by
 
 *[50]
 
 using a method described in Def Ex
 
 A,
 
 at 160 (Western States Association of Tax Administrators,
 
 Report of Committee on Railroad and Utility Valuation,
 
 1971;
 
 see
 
 table, "Railroad Company 'A’ Cost Indicator,” line 9, which shows an adjustment to reflect obsolescence). This is allegedly achieved by applying 70 percent weight to the cost approach and 30 percent weight to the income approach (Tr 415) to arrive at a modified cost approach. This formula is intended to reflect an adjustment for obsolescence but its explanation remains obscure to the court.
 
 (See
 
 Tr 415-423.)
 

 In his cost approach, the witness gave consideration to all the railroad operating property and equipment, including construction work in progress, materials and supplies, and then states (Def Ex D, at 8, and Def Ex E, at 9): "This indicator includes the value of rail equipment leased to others but does not include the appraised value of rail equipment leased from others.”
 

 In Def Ex D, 6, defendant’s Green points out that certain rail transportation properties of the plaintiffs, located in Oregon, which should be deemed a part of the subject
 
 operating
 
 rail transportation system apparently have not been included in the schedules of operating property in the ICC reports. Adjustment was made therefor.
 

 In his written report, the witness has stated:
 

 «* * * An amount equal to accumulated deferred income tax credits has been identified as property acquired with contributed capital and deducted from the cost approach, so that each of the three system value indicators represents the same quantity of rail transportation properties. However, as this rail property acquired with funds derived from deferral of income taxes is assessable, an estimate of its market value is added to the rail transportation system value.” (Def Ex D, 8; Def Ex E, 8.)
 
 {See
 
 Tr 486-487, 516-517.)
 

 In his income approach (Def Ex D, 9-14, Def Ex E, 9-15; and accompanying schedules), the defendant recognizes that
 

 
 *[51]
 
 "* * * the income to capitalize should be within the appraisal context of an anticipated average annual income stream to be received over the remaining life of the existing rail transportation properties. This is the total income stream a prospective purchaser would reasonably expect annually to provide a return
 
 on
 
 his purchase price as well as a return
 
 of
 
 that purchase price.” (Emphasis supplied.) (Def Ex D, at 9.)
 

 He then goes on to say (Def Ex D, at 9):
 

 "As the rail properties included in this appraisal do have a limited life, my research and analysis in preparing this appraisal led me to conclude that the present value in perpetuity computation used in prior years is incorrect. It is folly to make a perpetual life income estimate when the available data indicates that the BN rail properties have a remaining life of 19 years as developed on schedule E-5 [Def Ex D, App, Sched E-5].
 

 CSee also
 
 Tr 349-350 for further explanation.)
 

 The witness further pointed out that the reported net railway operating incomes prepared by railroads in accordance with the ICC Uniform System of Accounts provides an insufficient basis for estimating an income to be capitalized. For example, the ICC requires railroads to use a retirement-replacement-betterment accounting system for tax structure in its Accounts 8, 9, 10, 11 and 12 and a depreciation accounting system for all other depreciable properties. He refers to criticism of this hybrid method in Def Ex B, the National Association of Tax Administrator’s 1954 Report of the Committee on Unit Valuation,
 
 Appraisal of Railroad and Other Public Utility Property for Ad Valorem Tax Purposes,
 
 25-29.
 
 {See
 
 Def Ex D, 9-10.)
 

 The defendant’s witness notes other ICC accounting rules which tend to cause incomes to be understated; e.g., the ICC prescribes that when the cost of acquisition of units of road property and of additions and betterments to existing units of road property (other
 
 *[52]
 
 than land or tracks) is less than $1,500, such cost shall be charged to operating expense; other items less than $1,500 in cost which are directly charged to operating expense include electric typewriters, calculators, mobile radios and office furniture. (Tr 346; Def Ex D, 10.)
 

 Also, under the ICC Uniform System of Accounts, all federal income tax expense is charged against rail transportation income and none is charged against other income (which is chiefly income from nonoperat-ing property). Consequently, for this appraisal, federal income tax expense, accrued and deferred, has been allocated by the witness between transportation income and nontransportation income (as shown in Def Ex D, App, Sched E-3; Tr 348). The hypothetical prospective, knowledgeable purchaser would adjust the ICC income statements to ascertain the net income in order to estimate the future income stream to determine whether it would provide the funds necessary to return the purchase price over the remaining life of the existing depreciable property and to pay the necessary profit to justify the investment. Defendant’s Green, therefore, has taken certain dollar amounts identified as road property depreciation, equipment depreciation, and track structure maintenance and added these to the probable future average annual net operating income (shown on Def Ex D, App, Sched E-4). This future income stream is then converted to present worth, including salvage (as shown on Sched E-4, at lines 21-28). The present worth factor is found to be 8.3649 on compound interest tables for a 10 percent capitalization rate, based on a 5-year average, 1971-1975, of prior rates. (The capitalization rate was established by defendant Green’s supervisor, Mr. Victor N. Bredehoeft. Tr 548-555; Def Exs G and H. Defendant’s Green made no study of his own. Tr 466, 469.) A remaining useful life of the plaintiffs’ real properties is an estimate based on data developed on Sched E-5 and found to be 18.88 years, rounded to 19 years.
 

 
 *[53]
 
 Salvageable railroad properties at the end of their remaining useful life include (1) land and non-depreciable grading at cost; (2) track and other road property at 5 percent of cost (residual value); and (3) equipment property at a 10 percent of cost (residual value). Defendant’s Green found a total salvage value of $656,126,000 (as shown on Def Ex D, App, Sched E-4, line 28). The present worth of this salvage or reversion value was obtained from the compound interest tables for a 19-year period using a factor of 0.1635, indicating that a total salvage value of $656,126,000 had a present net worth as of the assessment date of $107,280,000. (Def Ex D, at 13, and App, Sched E-4.)
 

 The total income to be capitalized was essentially based on a 5-year average of net railway operating income (as shown in Def Ex D, at 13-14, and App, Scheds E-3 and E-4). In Def Ex D, App, Scheds E-l and E-3, an adjustment was made to reported income by adding a portion of the federal income tax expense which had been deducted by plaintiffs but was attributable to nonoperating income which is outside the scope of this appraisal. Depreciation and maintenance equivalent to depreciation, involving replacement of track structure, not depreciated under ICC’s retirement-replacement accounting rules, are summarized in Def Ex D, App, Scheds E-l and E-2.
 

 The capitalized income value indicator (including salvage residual value) as of January 1, 1976, was found to be $1,673,280,000. This indicator does not include the value of rail transportation property acquired with contributed capital resulting from deferral of federal income taxes. It does include the value of rail equipment leased to others but does not include the appraised value of rail equipment leased from others. (Def Ex D, 14.) Using the same methods, the capitalized income value indicator for January 1, 1977, was found to be $1,809,550,000. (Def Ex E, 15.)
 

 
 *[54]
 
 Defendant’s Green made a careful study of the stock and debt value indicator for the owned rail transportation properties as of January 1, 1976, and January 1, 1977, developing values of $938,497,000 and $1,031,300,000, respectively. (Def Ex D, 16; Def Ex E, 18.) However, the witness discarded the stock and debt approach in his correlation, giving as his reasons (1) that only a very small percentage of the total outstanding securities are traded in the marketplace, (2) that the sales and purchase of the shares or interest are not necessarily made by knowledgeable sellers and buyers and (3) only if there is an attempt to purchase control of the corporation through purchase of its stock can a true "market” situation be established. (Tr 512-513.) In Def Ex D, at 19, the witness has stated a fourth ground:
 

 "The Stock & Debt value indicator may be useful in some cases where the sum of the security values essentially represents the system to be appraised. However, Burlington Northern is so heavily diversified with its natural resource and other non-rail transportation businesses that an allocated value for the railroad properties in this appraisal is unreliable and suspect regardless of the allocation method employed. This allocated stock and debt value of rail transportation properties should receive negligible weight in this appraisal.”
 

 In fact, the witness gave no weight to it whatsoever. (Tr 360.) As stated above, he accorded a 30 percent weight to the cost approach and 70 percent to the income approach in his correlation, stating that none of the approaches to value is sufficiently strong to be relied on solely for a conclusion of the market value of the subject property. (Tr 356, lines 19-22; Def Ex D, 19.) This weighted "market value” estimate for the subject property, "excluding property acquired with contributed capital,” amounted to $1,762,000,000. (Def Ex D, 19.)
 

 After correlating the results of the three approaches to value and obtaining the weighted figure of
 
 *[55]
 
 $1,762,000,000, as above described, defendant’s Green made three important adjustments to this figure.
 

 He first added the sum of $164,000,000 of "property acquired with contributed capital,” based upon a figure of $194,678,000 taken from the plaintiffs’ balance sheet, identified thereon as accumulated deferred income tax credits (a bookkeeping device for federal income tax purposes, representing the future tax payments arising from the taxpayers’ adoption of accelerated depreciation schedules for federal income tax purposes). (Tr 360-361; Def Ex D, 19.)
 

 His second adjustment was to add a figure of $274,488,000, representing the true cash value of railway freight equipment, locomotives and freight cars leased by the plaintiffs for their own use from other owner-lessors. The figure of $274,488,000 was developed as shown in Def Ex D, App, Sched LP-1, and inserted in Def Ex D’s Summary Work Sheet (first schedule in the Appendix in Def Ex D, at line 16, col 8). (Tr 361.)
 

 The third adjustment was to deduct the true cash value of the plaintiffs’ rail equipment leased to others, using the same formula as in the second adjustment, shown as a deduction of $4,080,000 (in Def Ex D, App, Summary Work Sheet). (Tr 361.)
 

 These adjustments resulted in the sum of $2,196,408,000 which defendant’s Green submitted as the true cash value of the subject property as of January 1, 1976, and the universe from which allocation must he made to Oregon pursuant to ORS 308.550(1) and (2).
 

 Mr. Green’s system of allocation is set out in detail in Def Ex D, at 20-21. He concluded that the portion of the total true cash value of $2,196,408,000 allocable to Oregon was 2.68 percent, based on an average of the past three years’ allocation factors which were developed, utilizing the NATA formula with certain modifications (found in Def Ex D, App, Sched A-2). As stated in Def Ex D, at 20-21:
 

 
 *[56]
 
 "* * * As use factors have been utilized to obtain the Oregon rail property cost (quantity) element for equipment, the annual Oregon NATA allocation factor composed of the cost element and two use elements (freight ton miles and tonnage) may fluctuate widely from year to year. Also, a long recognized weakness in allocating equipment cost or value to states based on unit miles traveled is that unit miles does not reflect the presence of equipment in a state as it awaits loading or unloading. A time statistic, such as locomotive days for engines and car days for freight cars, would reflect presence in the state of such equipment both running and standing with more accuracy. Car day information was requested by the Department’s counsel in a letter of November 21, 1977 to correct this problem.
 

 "A capitalized income value addition of $1,060,000 is made at line 22 column 8 of the Summary Worksheet [Def Ex D, Appendix] to fully reflect the value of certain rights of way and stationgrounds located in Oregon, the income from which in part has been separately reported as account 510 Miscellaneous Rent Income [ICC reports].
 

 The witness recognized that a further deduction should be made for the plaintiffs’ Oregon licensed motor vehicles but he had not obtained the necessary data at the time of making the appraisal report. (Tr 363.) Based on the formula and adjustments acted upon, he found the allocated Oregon value for January 1, 1976, to be $59,960,000. (Def Ex D, at 21.) Following the same procedures, he found an allocated Oregon value for January 1,1977, of $58,320,000. (Def Ex E, at 24-25.)
 

 There is a reasonable agreement as to percentage of Oregon value but a súbstantial difference between the conclusions of allocated value between plaintiffs’ Green and Woolery and defendant’s Green:
 

 1976 1977
 

 John E. Green..........................................................................
 

 $21,195,000 (2.826%) $22,232,000 (2.779%)
 

 Arlo Woolery............................................................................
 

 $20,596,000 (2.71%) $20,944,000 (2.72%)
 

 Richard V. Green.....................................................................
 

 $59,960,000 (2.68%) $58,320,000 (2.56%)
 

 
 *[57]
 
 Counsel for the defendant strongly objected to the offer of testimony from plaintiffs’ final witness, Mr. John C. Goodman, who, at the request of plaintiffs sought "to merely present a critique of the methodology and practices and procedures” used by defendant’s Green (Tr 733). Mr. Goodman is a vice-president of the American Appraisal Company, Milwaukee, Wisconsin. Counsel’s questions elicited admissions from him which showed that he had far less experience in the appraisal of utilities than plaintiffs’ Green and Wool-ery and defendant’s Green and that he never had fully appraised an operating railroad unit (including the subject property) for ad valorem tax purposes. Nevertheless, Mr. Goodman had undertaken to analyze, evaluate and weigh the appraisal work of defendant’s Green as developed in his written appraisals, Def Exs D and E.
 

 Whether such testimony is admissible has not been clearly decided.
 
 See
 
 McCormick,
 
 Law of Evidence
 
 (West 1954), "Expert’s Opinion Based on Reports of Others,” 32-33, and cases cited therein;
 
 Reid v. Yellow Cab Co.,
 
 131 Or 27, 279 P 635, 67 ALR 1 (1929).
 

 However, it appears sensible to hold that no single appraiser’s personal concept of appraisal standards should be substituted for the consensus of the established and accepted texts (which continue, in their impartiality, to illustrate the inherent difficulty in the approaches to value) and there is little to be gained from the opinions of an appraiser who has not actually appraised the subject property.
 
 Cf Astoria Plywood Corp. v. Dept. of Rev.,
 
 6 OTR 40 (1975). Our best reliance is based on the use of the adversary system in obtaining the facts and judgments from skilled, experienced property appraisers who have examined the properties in contemplation of a trial and with the expectation of examination and reexamination, under oath, on the witness stand.
 

 Accordingly, Mr. Goodman’s testimony (Tr 727-751) has not been relied upon by the court. (However, this is
 
 *[58]
 
 not to say that his warning that the valuation of a unit should not deteriorate into a fractional appraisal (Tr 735-736), and other generalizations, have been rejected by the court. For example, the court has taken note of the three adjustments made by defendant’s Green to the true cash values of the subject property as of January 1, 1976, and 1977, which he determined upon his correlations; the court has removed therefrom the addition made by Mr. Green for "property acquired with contributed capital” and has concluded that the adjustments relating to leased equipment
 
 (see
 
 Tr 717-726) should be reexamined by the defendant.)
 

 Each of the expert witnesses labored mightily and in good faith to present complete appraisals of the subject property for the two years in question for ad valorem tax valuation purposes but, presumably because of the state of the art and the limitations of time and money (which affect all human transactions), while the results of each appraiser are technically "acceptable” and useful, they are not wholly convincing (and language used by each of the appraisers during his testimony evidences his recognition of this possibility).
 

 Following trial and after receipt of a transcript of the testimony, counsel for plaintiffs and defendant filed post-trial briefs which have proved of great assistance to the court in defining the issues which were deemed by counsel to be significant. Eleven issues were listed, described and argued in Plaintiffs’ Opening Brief and Reply Brief and, with two exceptions, rejected by the defendant in its "Respondent’s [sic] Brief.” These are taken up in the order proposed by the plaintiffs’ counsel, using counsel’s title and description, as follows:
 

 "A.
 
 Type of Income to be Capitalized.
 
 It is the plaintiffs’ position that the income to be capitalized is net income after depreciation. The Department has erroneously chosen to capitalize an alleged form of cash flow or income before depreciation. * * *” (PI Open Br, 7.)
 

 
 *[59]
 
 The parties and the court agree that the income approach is the most useful of the three approaches in light of the facts developed by the testimony. In Plaintiffs’ Opening Brief, 30-41, plaintiffs argue that the income to be considered for the income approach should be income less depreciation and not income "before depreciation.” As an aspect of this issue, plaintiffs denounce the method of capitalization used by the defendant, described by plaintiffs as "Capitalized Income by the Annuity Method.” (PI Open Br, 41.) Defendant, in its answering brief, beginning at 14, points out that the development of a capitalized income indicator involves the establishment of three facts: the amount of income to be received [over the useful life of the property]; the time of receipt [the determination of the useful life]; and the discount rate [the value on the assessment date of the predicted future income], "Once these facts are known, the procedure to follow in determining the value is dictated by the laws of compound interest.” (Resp Br, 14.) The court notes that each of the expert appraisers agreed with these general statements (each of which is described in the accepted treatises), but these generalities allow some differences in procedure.
 

 The defendant has the better of this argument. Its concept of the income to be considered is the same as that which would be contemplated by the hypothetical willing seller-willing buyer as the income producible by the subject property. The income will be used by the buyer to give him proceeds for offsetting depreciation and to give him a return on his total investment at a rate acceptable in the market. This hypothesis appears to be better understood by the defendant’s expert witness than the witnesses on behalf of the plaintiffs (who appeared to the court to be a little more formalistic and, in some measure, somewhat mechanical in their approaches to value). There is no doubt in the court’s mind that the defendant’s mathematics demonstrate that its income approach provided the prospective purchaser with a return of his depreciation and
 
 *[60]
 
 with a return on his investment.
 
 (See
 
 Resp Br, App A, and the argument at 14-31.)
 

 "B.
 
 Level of the Capitalization Rate.
 
 The plaintiffs’ position is that the capitalization rate adopted by the Department is too low, * * (PI Open Br, 7.)
 

 Plaintiffs’ Green found a capitalization rate for the tax year 1976 at 10.5 percent (PI Ex 20, at 39) and for 1977 at 10.75 percent (PI Ex 21, at 40). As noted above, plaintiffs’ Green made use of the information gained in the stock and debt approach to determine the rates of return of the interest on the imbedded debt, on the common equity, and the relation of each of these amounts to the other, following a "band of investment” concept.
 
 {See
 
 PI Ex 20, at 37, and Ex 21, at 38.) Defendant criticizes this method because the capitalization rate is based on an individual company’s cost of capital and not a market rate. (Resp Br, 31.)
 

 Mr. Woolery’s rate was 11 percent for 1976 (PI Ex 22, at 39) and 11 percent for 1977 (PI Ex 23, at 38). In Mr. Woolery’s selection of a capitalization rate, he has made use of "the band of investment or weighted cost of capital method.” As stated in his appraisal report (PI Ex 22, at 43-44):
 

 "* * * The capitalization ratios for the market value of different parts of the company’s capital structure were determined first. Then the market rates of return for various securities similar to those in the Burlington Northern, Inc. capital structure were selected from the averages shown in addenda items A and B. Using the capitalization ratios for weighting purposes, the average rate of return for each type of security was multiplied by the percent of Burlington Northern’s capital structure represented by that type of security. * *
 

 Although similar to the method followed by plaintiffs’ Green, the utilization of the addenda items A and B in Mr. Woolery’s appraisal report makes greater use of the market.
 

 Defendant’s Green did not construct his own capitalization rates but accepted those supplied to him by his supervisor, Mr. Victor N. Bredehoeft.
 
 {See
 
 Def
 
 *[61]
 
 Exs G and H.) Mr. Bredehoeft, in turn, had relied upon statistical data gathered year after year by his technical assistant, Mr. T. E. Cropper. Mr. Cropper made a recommendation of 10 percent for the capitalization rate to be used with Class I railroads for 1976, based upon an average of such rates for each year including the period 1971-1975, inclusive. This was approved by Mr. Bredehoeft and used by defendant’s Green (Def Ex D, at 12). For the year 1977, Mr. Cropper made no recommendation but he found that the 5-year average, 1972-1976 for Class I railroads was 10.9 percent. Mr. Bredehoeft, as supervisor, adopted 10.5 percent and this was used by defendant’s Green (Def Ex E, at 13).
 

 Defendant’s Exhibits G and H show that Mr. Bredehoeft’s use of the average was very conservative and did not give any weighting to the more recent years, 1974 and 1975 (and in Def Ex H, to 1976), the rates for which indicated a significant upward curve, apparently disregarded by Mr. Bredehoeft.
 

 In the use of the income approach, every percentage point of the capitalization rate is of great significance, particularly so when dealing in amounts as large as those which are typical in these suits.
 
 See Feves v. Dept. of Revenue,
 
 4 OTR 302, 304-305 (1971). Upon consideration of all the testimony presented upon this point, it is the court’s conclusion that the capitalization rate for the 1976 tax year should be not less than 10.5 percent and for the 1977 tax year, not less than 11 percent.
 

 A question raised by plaintiffs under their issue "B,” contending that defendant’s capitalization method does not in fact provide for the recovery of the capital which the hypothetical purchaser has invested, is fully disproved by the defendant.
 
 {See
 
 PI Open Br at 55-58 and App B and C, and Resp Br, 37-38, and App A.)
 

 "C.
 
 Allocation and Significance of the Stock and Debt Approach.
 
 In allocating the gross stock and debt value between the rail properties involved in this proceeding
 
 *[62]
 
 and all other properties, the Department has utilized an allocation factor consisting of a weighted average percent of property cost and income (Ex. D, p. 16). This results in an effective allocation factor of 71.81 percent to the rail properties. This is patently absurd. * * *” (PI Open Br, 58.)
 

 Plaintiffs’ Green found an allocation factor of 50.62 percent. Mr. Woolery’s factor was 55.55 percent. Whether defendant’s allocation factor was "patently absurd” is moot because, in his correlation, defendant’s Green rejected the method.
 

 The ethical appraiser is required to give consideration to each of the three standard approaches to value (or substituted modes, such as the stock and debt approach). Having done so, it is a matter of the appraiser’s judgment as to the use or weight to be given to each approach. The department’s rule (which has the force of law in these proceedings), OAR 150-308.205-(A)(2), states:
 

 "Methods and Procedures for Determining True Cash Value: Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances.”
 

 Defendant’s Green in his appraisal report (Def Ex D, at 19) states:
 

 "The Stock & Debt value indicator may be useful in some cases where the sum of the security values essentially represents the system to be appraised. However, Burlington Northern is so heavily diversified with its natural resource and other non-rail transportation businesses that an allocated value for the railroad properties in this appraisal is unreliable and suspect regardless of the allocation method employed. This allocated stock and debt value of rail transportation properties should receive negligible weight in this appraisal.”
 

 Plaintiffs’ Green also testified to the dubiety of the results of the stock and debt approach, used as a
 
 *[63]
 
 substitute for the normal market data approach in the appraisal of railroad property. In his appraisal report for 1976, he stated:
 

 “* * * The Stock and Debt Approach is considered to be a very poor substitute for the normal Market Data Approach, particularly in the appraisal of railroad property. * * *” (PI Ex 20, at 12.)
 

 "As stated earlier in this report, there are serious flaws in the assumption that the use of the trading prices of a limited number of securities will actually result in a figure which is the market value of all of the equity position and creditor claims. Thus, when the indicated value of the equity position and creditor claims are combined, the figure which results purports to be the value of the total corporate enterprise. The figure thus derived is the poorest indication of value for the railroad property. When the appraiser is dealing with a railroad in which the equity shares do not trade on the open market and where many of the debt obligations are not traded on the open market, he is faced with an extremely difficult task in attempting to use the Stock and Debt Approach.
 

 "* * * There is also the problem of assuming that the price at which a small portion of the securities have traded would be attributed to the entire outstanding obligations. * * *” (PI Ex 20, at 13.)
 

 "It is my opinion that the Stock and Debt Approach should not be used if there is sufficient information available to allow the appraiser to have a complete Cost Approach and Income Approach. The Stock and Debt Approach has tremendous problems involved with its use, and the number of assumptions which the appraiser must make in order to use this approach renders any value conclusion from its use to be highly doubtful as to its validity.” (PI Ex 20, at 14.)
 

 Plaintiffs’ Green rationalized his use of the stock and debt approach on the ground that the courts approve it. It is impossible to tell how much reliance plaintiffs’ Green placed in this approach, in spite of his awareness of its weaknesses, but, upon examination of his final result, the defendant believes it must have been accorded considerable weight. (Resp Br, at 4.) Mr.
 
 *[64]
 
 Woolery favored the use of the stock and debt approach and was highly defensive of it. (PI Ex 22, at 11.) (A useful historical discussion of the approach is to be found in 1 Bonbright,
 
 Valuation of Property
 
 (1937), at 553, 614-619.)
 

 This court approves the judgment of the defendant’s Green in his study and elimination of the stock and debt approach from final consideration in his correlation, under the facts found in these suits (where the plaintiffs’ enterprises are so diversified and the plaintiffs’ total net income so heavily preponderates to the nonrailroad operations).
 

 "D.
 
 Replacement Cost."
 

 In plaintiffs’ Opening Brief, 60a-61, plaintiffs cite reasons why they believe that ''the Department’s evidence pertaining to replacement costs should be disregarded. * * *”
 

 However, defendant’s Green did not make use of the replacement cost for reasons stated in his testimony and in his appraisal report (Def Ex D, at 7-8):
 

 "In the absence of market data for a rail transportation system such as BN, any value evidence having some validity should be considered. I believe the cost approach should be considered in this appraisal. * * *
 

 "* * * As replacement cost data has not been readily available and would naturally be a higher value indicator even with adjustment made for obsolescence, book cost less depreciation and obsolescence has been utilized as the cost approach in this appraisal. * * *
 

 "The cost indicator of value is the book cost, less adjusted depreciation, of all railroad property and equipment including construction work in progress and materials and supplies shown at line 39 of schedule C-2 owned in the names of Burlington Northern, Inc., Spokane, Portland and Seattle Railway, Oregon Electric Railway and Oregon Trunk Railway. Using a method shown on page 160 of the 1971 Western States Association of Tax Administrators Report on Railroad and Utility Valuation, a further adjustment was made to reflect functional and economic obsolescence at line 4 column 6 of the summary worksheet in the appendix [to Def Ex D]. * *
 

 
 *[65]
 
 However, the court finds error in the defendant’s cost approach resulting from defendant’s Green having added to the rail transportation system value his estimate of "rail property acquired with funds derived from deferral of income taxes * * (Def Ex D, at 8.) In the court’s opinion, no funds are derived from the deferral of income taxes and it behooves the appraiser to ascertain the property in existence or under construction through more definitive and reliable sources. (An excellent description of the accounting problem of "timing differences” and recognition of the difference between tax accounting and financing accounting, leading to deferred tax accounts for income tax purposes, is found in the testimony of plaintiffs’ witness, Mr. Russell D. Tipton (Tr 573-592).)
 

 As stated in
 
 Pacific Power & Light Co. v. Dept. of Rev., supra,
 
 7 OTR 203, 236
 
 (modified and remanded
 
 286 Or 529, 596 P2d 912 (1979)), the court can find no basis for imposing property taxes upon alleged values which are "created” in the plaintiffs’ bookkeeping as a convenience in clarification of the time scheme under which the taxpayer pays its federal income taxes.
 

 As stated in 7 OTR, at 231, in the same case:
 

 «* * * Any values growing out of 'deferred taxes’ for property tax purposes will be reflected in the cost approach (HCLD) and in the stock and debt approach. They are a deductible expense as reported in the income approach.”
 

 The items of property used in the cost approach should be specific parcels or items for which specific "costs” have been paid when the property was acquired. The court is unable to visuálize any way in which the use of a figure for "deferred taxes,” standing alone, can be used in lieu of the specific property. As Mr. Woolery remarked (at 31-32 of this decision,
 
 supra),
 
 he found no instance where a person in the market was seeking to buy "deferred taxes” as "property.” {SeeTr 278, 573-592; PI Exs 29, 30, 31 and 32.)
 

 
 *[66]
 
 "E.
 
 Salvage Value.”
 

 Plaintiffs argue that the defendant should not have made use of the item "salvage value” in defendant’s income approach (Def Ex D, App, Sched E-4, Lines 21-28, and in Def Ex D, 22; plaintiffs’ arguments are found in its Open Br, at 61-63. Defendant’s arguments are found in its brief, at 38-40). The court agrees with the defendant that plaintiffs’ arguments are misleading and logically unsound and that defendant’s use of the salvage value in the income approach, using a limited property life, is acceptable and necessary. (Plaintiffs’ Tipton corroborates defendant’s Green in the use of salvage values in Tr 616). However, plaintiffs’ witness, Mr. Raymond L. Burton, raised a pertinent question as to the defendant’s witness in his use of a 10 percent rate (Tr 701-714).
 

 "F.
 
 The Degree of Obsolescence Allowance.
 
 The defendant’s unique and rather breezy approach to determining the degree of obsolescence present in the plaintiffs’ properties is in sharp contrast to the approaches followed by plaintiffs’ expert witnesses John Green and Arlo Woolery. * * *” (PI Open Br, 63.)
 

 "Where the plaintiffs’ witnesses have used methods recognized by appraisal authorities, the Department has utilized a mere computation with no foundation, study or rationale (Tr. 414-418). * * *” (PI Open Br, 64.) Plaintiffs’ Green and Mr. Woolery used a study of
 

 selected "blue chip” operating railroad units as a basis for comparing plaintiffs’ operation, in order to obtain some indicator of functional and economic obsolescence. For 1976, plaintiffs’ Green found an indicator for obsolescence of 54.38 percent (PI Ex 20, at 29) and Mr. Woolery, using a similar method, 75.18 percent (PI Ex 22, at 26). (The substantial difference between the two witnesses raises doubts as to their procedures.)
 

 Defendant’s Green explains his treatment of obsolescence:
 

 «* * He Using a method shown on page 160 of the 1971 Western States Association of Tax Administrators Report on Railroad and Utility Valuation [Def Ex A], a further adjustment was made to reflect functional and
 
 *[67]
 
 economic obsolescence at line 4 column 6 of the summary worksheet [the first work sheet in Def Ex D] in the appendix. * * *” (Def Ex D, at 8.)
 

 Returning to Def Ex A at 160, we find at line 9: "Cost Indicator of Value AFTER ADJUSTMENT TO REFLECT OBSOLESCENCE (759,165,000 x .70 + 523,000,000 x .30) = $688,000,000.” Mr. Green explains this line (Tr 415):
 

 "On page 160, it’s shown as a technique of applying 70 percent weight to the cost approach and 30 percent weight to the income approach to arrive at a modified cost approach, having reflected adjustment for obsolescence.”
 

 Plaintiffs’ counsel asked defendant’s Green to explain the mathematical calculation in line 9 and was answered by Mr. Green (Tr 416-417):
 

 "That’s—that’s the technique or method and it is used to provide recognition that the income approach does tend to reflect obsolescence.
 

 * * * sf:
 

 "That’s my obsolescence adjustment to the cost approach.
 

 ******
 

 "The theory is that—that I would blend the income approach with the cost approach, knowing that there’s an obsolescence—that the obsolescence of the properties is reflected in the income approach to accomplish a recognition of obsolescence in the cost approach.”
 

 Defendant’s Green admitted that he had no precise standards of measurement for obsolescence and the sole basis or sole justification of his mathematical calculation was what he observed on line 9 of the schedule in Def Ex A, at 160. He concluded that he had allowed 10.5 percent. (Tr 423.)
 

 Respondent’s Brief, at 40-41, gives no real defense of defendant’s Green’s method for determining obsolescence, as described above, and suggests that the issue of obsolescence is eliminated through a proper income approach and "[tjhere is no need to speculate on obsolescence in the cost approach * *
 

 
 *[68]
 
 However, defendant’s Green has justified the use of the cost approach and it is recognized by all authorities that one of the most significant requirements in that approach is the necessity of determining the accrued depreciation (which includes physical deterioration, functional obsolescence, and economic obsolescence) of the improvements included in the subject property.
 
 {See The Appraisal of Real Estate
 
 (7th ed, rev 1978),
 
 supra,
 
 at 263;
 
 Encyclopedia of Real Estate Appraising
 
 (Friedman ed, rev & enlarged ed 1968), at 77.) It appears to the court that obsolescence must be given full and careful consideration in the cost approach if the value indicator obtained thereby is to have some relationship to the value determined by the income approach (which approach automatically eliminates the problem of obsolescence in the appraiser’s determination of the remaining useful life of the property and the amount of income which can be produced in the allotted time).
 

 The court concludes that the defendant’s treatment of obsolescence in its cost approach is not satisfactory. It was not fully explained and was not understood by the court.
 

 "G.
 
 Perpetual Life v. Limited Life Appraisals.
 
 Plaintiffs contend their common carrier operations should be appraised on a perpetual life basis rather than on a limited 19-year useful life utilized by the Department’s appraisal.” (PI Open Br, 8.)
 

 In PI Open Br, 66-73, plaintiffs set forth a number of arguments, seeking to undermine the limited life of 19 years attributed by defendant’s Green to the plaintiffs’ depreciable property, the plaintiffs protesting that the railroad cannot terminate its activity upon the completion of a finite number of years without federal authority and that abandonments and discontinuances of service are permitted only with ICC approval and the like. (Tr 424-425.)
 

 Defendant has properly answered these irrelevant arguments by reminding plaintiffs that the questions
 
 *[69]
 
 presented before the court concern the valuation of the plaintiffs’ operating railroad property as of January 1, 1976, and January 1, 1977, and it is the property in existence on those assessment dates which must be valued. (Resp Br, at 42.) The rebuttal by defendant’s Green was that he never contemplated that the life of the railroad operation would continue for only 19 years, at which point it would be sold for salvage; on the contrary, his determination of a remaining life of 19 years (developed in Def Ex D, App, Sched E-5) is what the potential buyer would be expecting to obtain on the assessment dates. It can be assumed that there would be continuing capital improvements by the purchaser over the subsequent years, resulting in additional properties being placed upon the assessment rolls, but the newly added properties (following the assessment dates before the court) or later maintenance investments to enable the plaintiffs to continue in the railroad business have nothing to do with the value of the January 1, 1976, and January 1, 1977, assessments. (Tr 428-430.)
 

 "H.
 
 Does the Account Entitled 'Accumulated Def erred Income Taxes’ Represent an Asset?
 
 Plaintiffs contend that the accounting entries neither represent monies set aside as a reserve nor an obligation to pay taxes whereas the Department’s appraiser treats the amount shown in the account as either a cash reserve or the equivalent in physical property over and above other assets shown on the books and records of the companies.” (PI Open Br, 8.)
 

 This court has already acted upon this issue in
 
 Pacific Power & Light Co., supra,
 
 7 OTR at 231, 236,
 
 modified and remanded on other grounds
 
 286 Or 529, 596 P2d 912 (1979).
 

 The court’s decision in the
 
 Pacific Power & Light Co.
 
 case is supported by the testimony in the present suit by the plaintiffs’ rebuttal witness, Mr. Russell D. Tipton, a certified public accountant, who testified on this issue. (Tr 573-592; PI Exs 29, 30, 31 and 32.) Mr. Tipton testified as to the "timing differences” that
 
 *[70]
 
 exist between book and tax accounting and demonstrated (by reference to PI Ex 29) how these differences may arise through the use of accelerated depreciation for tax purposes and straight-line depreciation for book purposes. Over an asset’s entire life, the total amount of depreciation taken for book and tax purposes is identical, but because of the election to use accelerated depreciation for income tax purposes, the amount of depreciation in any one year may be greater or less. (Tr 577-579;
 
 see also
 
 the plaintiffs’ argument in PI Open Br, 73-75.)
 

 Mr. Tipton testified that the deferred tax item on the balance sheet does not represent a liability and is reflective of an allocation of tax timing differences. A purchaser, buying the assets of the corporation, would not record any amount for deferred taxes. (Tr 591.) The account would simply be eliminated if the business were liquidated or sold; it cannot be carried over by a prospective purchase. This court has not been able to comprehend the theory of the defendant in including such an account as the equivalent of property owned for ad valorem tax purposes.
 

 "I.
 
 Method of Valuing Leased Equipment.
 
 Should equipment leased from others be valued by applying a capitalization rate to actual rentals over the remaining léase term, as contended by plaintiffs, or * * * over the assumed life of the equipment as utilized by the Department. * * *” (PI Open Br, 9.)
 

 In addition to the foregoing, the plaintiffs argued that the "level of the capitalization rate is in issue,” as well.
 

 ORS 308.510 defines "property” for the purposes of the statutes relating to the central assessment of utilities and railroads as including "all property, real and personal, tangible and intangible, used or held by a company as owner, occupant,
 
 lessee,
 
 or otherwise, for or in use in the performance or maintenance * * *” of the centrally assessed operation. (Emphasis supplied.) ORS 308.515 makes clear that property leased by the taxpayer for its use in the
 
 *[71]
 
 operation shall be taxed to the lessee; if property owned by the taxpayer is leased to others for their use, such property is excluded from the lessor’s railroad operation for ad valorem tax purposes. There is no difference between the parties herein as to the general principle, only as to the measure of value of the leased property.
 

 Plaintiffs’ arguments are set out in their Opening Brief, at 75-78. Plaintiffs refer to Def Ex D, App, Sched LP-1, and to PI Exs 27 and 28. Plaintiffs point out that the basic lease term is generally substantially shorter than the expected service life of the equipment and the lessee’s obligation at the end of the lease term is to return the equipment to the owner. Plaintiffs disagree with defendant’s present worth calculations in two aspects: The defendant assumes 10 percent residual value whereas the plaintiffs’ witness, Mr. Raymond Burton, testified to a residual value of at least 20 percent. (Tr 707.) Additionally, "the defendant has erroneously assumed that the annual rental payments are applicable to the entire remaining economic life of the equipment, rather than the basic lease term. * * *” (PI Open Br, 76.)
 

 The court accepts the gravamen of the defendant’s argument (found in Resp Br, at 46):
 

 "Also plaintiffs refer to the Department’s method of adding leased equipment as a deviation from a unit appraisal. Plaintiffs have supplied no authority indicating a classic unit appraisal method of valuing utility property. A typical method is to value as a unit but leased equipment or exempt equipment can be added or deducted in the manner herein which is reasonable and proper.
 

 "Plaintiffs have cited no authority opposing the Department’s method of appraising leased equipment. The property must be assessed, as if owned in fee, to the user. Plaintiffs have not opposed the Department’s statutory choice. ORS 308.517. Plaintiffs are seeking to limit the value to a leasehold interest which is not proper.
 

 
 *[72]
 
 "Plaintiffs’ only witness on leased equipment is Mr. Burton and as noted, in the quote above, he was not seeking market value.”
 

 The court concludes that the unit appraisal method of valuing utility property is not erroneously affected by adding on the true cash value of the leased equipment used by the plaintiffs in the operation of the subject property and by deducting equipment owned by the plaintiffs and leased to others for use outside of the operation of the subject property. The leased property used by the plaintiffs must be assessed as if owned in fee by the user. ORS 308.517. Mr. Raymond Burton did not qualify as a property appraiser and consequently his argument that the residual value at the termination of the lease was at least 20 percent, as opposed to the defendant’s claim of a residual value of 10 percent, cannot be accepted by the court.
 

 "J.
 
 Unit v. Summation Method of Appraisal.
 
 Plaintiffs contend that the Department has improperly and erroneously mixed a unit valuation approach with a summation approach to value resulting in double counting.” (PI Open Br, 9.)
 

 All the parties are in agreement that in these suits the unit of the railroad operating property should be the basis for valuation as contemplated in ORS 308.555. Plaintiffs charge that the summation method has actually been used by the defendant. (A good discussion of the difference between the "fractional method,” the "summation method,” and the "unitary method” is found in PI Ex 25, at 6-8.) Plaintiffs designate the defendant’s appraisal as "a partial unit appraisal and a partial summation appraisal.” (PI Open Br, at 80.) The defendant has made a strong rebuttal of the plaintiffs’ arguments
 
 {see
 
 Resp Br, 46-47). As the defendant’s counsel has argued, there is no
 
 classicurát appraisal
 
 method of valuing utility property (and plaintiffs have cited no authority to the contrary). The issue presented is the true cash value of the property as of January 1, 1976, and January 1, 1977. In the
 
 *[73]
 
 court’s experience, there is no approach to value which is not subject to adjustments in a particular case. All the expert witnesses have made adjustments (e.g., see Mr. Woolery’s "deductions” and "add backs” in Tr 282).
 

 The validity of the adjustments depends upon the experience, judgment and common sense demonstrated by the particular appraiser and, of course, the fewer the adjustments required, the more persuasive is the approach. Except as otherwise specified in this decision, the court has found that the defendant’s witness, Mr. Richard V. Green, has shown judgment, based upon intelligence and experience, which carries conviction. All of his approved adjustments come within the rule of OAR 150-308.205-(A). Each element of the appraisal must be weighed by the court and it rejects the plaintiffs’ conclusion that the defendant has "improperly and erroneously mixed a unit valuation approach with a summation approach * * (PI Open Br, 81.)
 

 "K.
 
 Method of Allocating Value to Oregon.
 
 Department’s application of three-year allocation average is unlawful. Their one-year factor should be used.” (PI Open Br, 9.)
 

 The determinations by the three appraisal witnesses of the amount of the unit valuation which should be allocated to Oregon are impressively close. As of the assessment dates January 1, 1976, and January 1, 1977, respectively, plaintiffs’ Green found 2.826 percent and 2.779 percent; plaintiffs’ Woolery found 2.71 and 2.72; and defendant’s Green found 2.68 and 2.56 (the lowest of the three appraisers).
 

 The defendant’s witness explains his allocation as follows (Def Ex D, at 7):
 

 'To calculate the Oregon allocated value, or proportion of the ráil transportation system unit value assessable for taxation in Oregon, an allocation method, permitted within the latitude expressed in ORS 308.550(2), is used. This allocation formula, the NATA Railroad Allocation Formula with modifications, weights together
 
 *[74]
 
 one property quantity element and two use elements. It was developed and adopted by the National Association of Tax Administrators Committee on Railroad Allocation in 1949, and then recommended for use by states centrally assessing railroads. A modification of the formula, i.e., use of book cost undepreciated as the property element rather than ICC cost of reproduction less depreciation has been necessary since the ICC terminated its Bureau of Valuation in 1963. As a one year allocation factor fluctuates with business cycles, a 3 year average factor has been utilized to arrive at a more representative value of the Oregon rail transportation properties. Finally, an addition is made to the Oregon allocated value to fully reflect the value of certain rights of way and stationgrounds located in Oregon, the income from which in part has been separately reported as Account 510 Miscellaneous Rent Income.”
 

 Defendant’s witness further states (Def Ex D, at 20):
 

 "The allocated Oregon value amounted to: $2,196,408,000 x 0.0268 = $58,900,000. The Oregon allocation factor of 2.68% is an average of the past 3 year’s [sic] allocation factors developed utilizing the NATA formula with certain modifications on Schedule A-2. As use factors have been utilized to obtain the Oregon rail property cost (quantity) element for equipment, the annual Oregon NATA allocation factor composed of the cost element and two use elements (freight ton miles and tonnage) may fluctuate widely from year to year. Also, a long recognized weakness in allocating equipment cost or value to states based on unit miles traveled is that unit miles does not reflect the presence of equipment in a state as it awaits loading or unloading. A time statistic, such as locomotive days for engines and car days for freight cars, would reflect presence in the state of such equipment both running and standing with more accuracy. Car day information was requested by the Department’s counsel in a letter of November 21, 1977 to correct this problem.”
 

 Plaintiffs’ argument is found in PI Open Br, at 81-83. Defendant’s refutation is found in Resp Br, at 47. Its only pertinent statement is:
 

 
 *[75]
 
 "* * * Plaintiffs claim an average should not be used. However, its Ex. 40 review appraisal, Ex. A, page 159 employs a
 
 three-year
 
 allocation base as an average, the only allocation authority offered in this proceeding.”
 

 Defendant’s Exhibit D, App, Sched A-2, shows that the defendant obtained the allocation factor of 2.512 percent for January 1, 1976, based on the 1975 data, but this factor, as part of a 3-year average, was enlarged to 2.68. Defendant’s Ex E, App, Sched A-2, for January 1, 1977, shows an original factor of 2.431 percent, enlarged in the 3-year averaging to 2.56 percent.
 

 It appears to the court that the use of the 3-year average is an exercise of judgment which is sanctioned by ORS 308.550(2) and that the court cannot accept the plaintiffs’ conclusion that "[t]his methodology is not permitted by the statute.” (PI Open Br, at 83.) While it appears to the court on a superficial examination that the variation between recent years is not so great as to impose a requirement of averaging, the court also recognizes that it must rely upon the subjective judgment of the expert appraiser unless such judgment is demonstrated to be wrong, and no such demonstration has been made in this instance. Accordingly, the defendant’s method is accepted by the court, for want of better. (The court takes note of defendant Green’s comparisons of replacement cost and of salvage value in his appraisal report, Def Ex D, at 22, indicating that his apportionment of true cash value to Oregon is not immoderate.)
 

 Pursuant to the court’s Rule 26 ("Computations”), the entry of the decree in these suits will be withheld pending a recomputation by defendant of its appraisal and determination of true cash value of the subject property in each of the two tax years in accordance with this decision. The defendant, within 40 days of receipt of this decision, shall amend its appraisals and make the necessary recomputations in the following respects:
 

 
 *[76]
 
 1. The capital rate used in the defendant’s income approach shall be redetermined at a rate not less than 10.5 percent for 1976 and not less than 11 percent for 1977. ■
 

 2. The defendant’s adjustment for deferred income taxes, adding to the value found in defendant’s cost approach, shall be eliminated from that approach.
 

 3. The provision for obsolescence (functional and economic) in defendant’s cost approach shall be redetermined by defendant (at a rate which, in the court’s view, should be greater than defendant’s present 10.5 percent and not in excess of John E. Green’s 54.38 percent), with defendant’s appraisal witness presenting work sheets which reveal his underlying assumptions and data.
 
 (See Publishers Paper Co. v. Dept. of Rev.,
 
 270 Or 737, 754, 530 P2d 88, 97 (1974).)
 

 4. The defendant shall eliminate from its income approach the addition as income of the account entitled "accumulated deferred income taxes.”
 

 5. The defendant shall examine Mr. Burton’s criticism of defendant Green’s method of valuing the equipment leases, "rather than the value of the units” (Tr 717-726) to determine whether a correction should be made in defendant’s appraisal in this respect and to act on its conclusion or be prepared to defend its nonaction.
 

 6. Defendant shall study its appraisal report to see if the 1977 adjustment for railroad car use in Oregon (for which a deduction of $121,000,000 was allowed) (Tr 368) is not also applicable to the 1976-1977 tax year.
 

 7. In its allocation of value to Oregon for each year, defendant shall subtract an allowance for plaintiffs’ vehicles licensed and used in Oregon (using, if necessary, an aliquot portion of the figure supplied by plaintiffs’ Green in PI Ex 20, at 29).
 

 
 *[77]
 
 Upon its conclusion of the foregoing, copies of the defendant’s calculations, explanations, reasoning and supporting work papers shall be filed in the court, with proof of service of copies upon the counsel for the plaintiffs. If plaintiffs’ counsel believes that defendant’s work is not in accordance with this decision or is arithmetically incorrect, plaintiffs shall serve and file a computation believed by them to be in accord with the court’s decision within 20 days following receipt of the papers served by defendant. The court may require briefs or oral arguments or both before deciding on the proper computations.
 

 *
 

 The court’s consideration of numerous points in these extremely technical cases, leading to its final decisions, can best be understood by study of the official transcript and exhibits introduced by counsel, and of the cases cited by counsel and the court. Recognizing that the printed decision will be lengthy in any event, that it will be of interest only to a relatively small group of individuals and that they are trained to use the materials referred to herein and have relatively easy access thereto, the court has sought to prevent a drain on its printing budget by utilizing citations to the material in many instances in lieu of long quotations which might otherwise be printed.